575 So.2d 864 (1991)
Betty Jean PATTON, Plaintiff-Appellee,
v.
MINI-TOGS, INC., et al., Defendants-Appellants.
No. 22168-CA.
Court of Appeal of Louisiana, Second Circuit.
February 27, 1991.
Writ Denied April 26, 1991.
*865 Theus, Grisham, Davis & Leigh by Phil D. Myers, Monroe, for defendants-appellants, Mini-Togs and Travelers Ins. Co.
Bruscato, Loomis & Street by James L. Braddock, Monroe, for plaintiff-appellee.
Before MARVIN, C.J., and NORRIS and HIGHTOWER, JJ.
MARVIN, Chief Judge.
In this action to reinstate worker's compensation benefits that the insurer terminated in September 1988, the employer and its insurer appeal a judgment that awarded supplemental earnings benefits, contending the claimant was able to return to her former work when benefits were terminated. Answering the appeal, the claimant seeks temporary total disability benefits, penalties and attorney fees.
We amend to award penalties and attorney fees against the insurer and affirm the judgment as amended.

FACTS
Claimant, Mrs. Patton, sprained her left ankle on May 4, 1987, while leaving her first day of work as a sewing machine operator trainee for Mini Togs, Inc. The sprain was classified as severe. After emergency room treatment, she saw two orthopedists, Drs. Cline and Hand, and a rheumatologist, Dr. Rangaraj. Dr. Hand suspected, and Dr. Rangaraj confirmed, that Mrs. Patton has reflex sympathetic dystrophy in her left leg. According to Dr. Hand, reflex sympathetic dystrophy *866 typically occurs after a relatively minor injury. Most commonly it's either the ankle, the foot or the hand or wrist. And you'll see a patient with a relatively minor injury that just doesn't get well, they continue to complain of pain, the physical findings are fairly minimal, but what's happening is they're having some real pain and it's caused by some type of abnormal reflex involving the sympathetic nerves that are ... firing off in an abnormal manner.... it's more or less a diagnosis of exclusion. We exclude all the other causes for continued pain and then we see reflex sympathetic dystrophy. Later on there's some changes that we can see that are more measurable, but if you just look at these people in the early stages it's very hard to diagnose them because they appear to be normal.
Mrs. Patton saw Dr. Cline from May-August 1987, Dr. Hand from August-October 1987, and Dr. Rangaraj from October 1987 through the trial in September 1989. She was paid temporary total disability benefits from May 1987 until September 27, 1988. She did not return to work after her injury. Her primary complaint through the course of her treatment with Dr. Rangaraj, and at trial, was that pain prevents her keeping her left leg in one position longer than 45 minutes. She took anti-inflammatory medication daily and received physical therapy from time to time after the accident.
In February 1988, about nine months after Mrs. Patton's injury, the w.c. insurer, Travelers, hired a private rehabilitation company, Conservco, to evaluate Mrs. Patton's condition. In March 1988, Conservco sent Dr. Hand two job analysis forms describing the duties of a sewing machine operator and a snap machine operator. Robert Self, a Conservco employee, prepared the forms after visiting the Mini Togs plant. As described on these forms, both jobs require sitting for "7 hours & 40 minutes" and the use of foot pedals to operate the machines.
Dr. Hand, who last saw Mrs. Patton in October 1987, certified in March 1988 that she could perform the two jobs the Conservco forms described. Self testified that he sent Dr. Hand a third job analysis form which specifically described duties of a garment inspector, which was generally explained as a job that does not require constant sitting. Neither Dr. Hand nor Conservco had a copy of this form in their records.
On April 4, 1988, Mini Togs' president, Ed Hakim, wrote to Mrs. Patton:
After receiving two approved job description analyses from Mr. Robert Self of Conservco and signed by your physician, Dr. Hand, we are herewith advising you that we have either one of these two job descriptions open. It is our understanding that your doctor has approved for you to return to work in either one of these positions. We are holding these two jobs open for you for a period of 15 days ...
On April 6, Mrs. Patton wrote Mr. Hakim, stating that her treating physician was Dr. Rangaraj, not Dr. Hand, and that Dr. Rangaraj had not released her to return to work. In mid-April, Dr. Rangaraj confirmed to Mr. Self that he "would not allow [Mrs. Patton] to return to work at that time." In his report to the insurer about Mrs. Patton's visit on April 15, 1988, Dr. Rangaraj stated it was "highly unlikely at [this] time that she would be able to engage in any kind of gainful employment that requires sitting or standing for any length of time."
Dr. Rangaraj completed a "functional physical capacities evaluation form" for Mr. Self and Conservco on April 24, 1988. In this form, his primary restriction on her activities was that she "cannot manage any occupation that requires use of left lower extremity in any position for more than 30-60 minutes." His response to the question when Mrs. Patton would be able to resume full-time work was "indefinite."
In May 1988, Conservco informed Travelers of Dr. Rangaraj's evaluation. Travelers' adjuster, Bill Boston, recounted his May 1988 conversation with Mrs. Patton:
I talked with her myself by phone and she said she was still having some problems with her leg and her foot and she said she couldn't stand or walk very long *867 or the leg and the foot swells. So I decided not to terminate her comp at that time even though we did have information [from Dr. Hand] that would indicate that she could return to work.
Travelers continued paying weekly benefits until September 27, 1988. According to Mr. Boston, the decision to terminate benefits was based in part on Dr. Hand's opinion of March 1988 that Mrs. Patton could return to work as a sewing or snap machine operator, and on Dr. Rangaraj's report of her August 15, 1988, visit, which stated:
PHYSICAL EXAM: Shows no new findings. Continues to have some tenderness in the calf and left foot.
IMPRESSION: Continued reflex dystrophy. For now with the improvement shown with the medications, have her continue with the medications, add Tagamet, and do believe that she could attempt to return to work providing her current insurance carrier gives her a statement stating that they would be liable for future treatment for reflex sympathetic dystrophy of the left lower extremity. In receipt of such a statement in writing from the insurance people, I am sure that she will be eligible and will be willing to return to work, but try part-time basis first in a sedentary occupation to see if she can manage and if she can, get back to full-time work.
With these reservations, I have no hesitation in recommending that she attempt some kind of sedentary job, such as garment inspector listed by Ms. Susan Pyles from [Conservco].
Ms. Pyles worked under Self's direction for Conservco until the end of August, 1988. She did not compile any job descriptions but did obtain Dr. Hand's signature on the job analysis forms prepared by Self in March 1988. She "believed" she sent the same forms to Dr. Rangaraj, but did not recall when. Neither Dr. Rangaraj nor Conservco produced the written description of the specific duties of a garment inspector.
On September 22, 1988, after receiving Dr. Rangaraj's report of August 15, Mr. Boston of Travelers wrote to Mrs. Patton:
Dr. Rangaraj has indicated that you could return to work but that you will need continued treatment for your left foot and leg. Your medical cost for your leg and foot will continue to be paid for by The Travelers even if you return to work. I hope that you make a good recovery and that you can return to work.
Responding to Boston's letter, Mrs. Patton asked her employer about returning to work as a garment inspector. She testified that Hakim of Mini Togs told her the garment inspector position had been terminated and the employees who held those positions had been "laid off." Hakim testified that he told Mrs. Patton the garment inspector position had been moved from the sewing machine line into the shipping department and that she replied she "didn't want to work back there."
Mrs. Patton did not return to Mini Togs or seek work elsewhere. She testified, "I know I can't [work] ... because ... I can't sit ... or stand [for] very long at a time..." She and her husband testified that she is unable to do some of the housework she used to do and that she frequently changes the position of her leg, even while watching TV.
On September 20, 1988, a week before Mrs. Patton's benefits were terminated, Stephanie Ritter of Conservco sent Dr. Rangaraj a form letter asking if Mrs. Patton had reached maximum medical improvement and if she had been assigned a disability rating. Dr. Rangaraj answered "no" to the first question and "40%" to the second, without stating whether the disability rating applied to the leg or the whole body. In answer to the question when he anticipated maximum medical improvement, Dr. Rangaraj answered, "Indefinite she flares up from time to time."
Conservco received the form with Dr. Rangaraj's responses on October 6, 1988, about a week after Mrs. Patton's benefits were terminated. Conservco had closed its *868 file two days earlier, on October 4, when Ms. Ritter reported to Travelers:
... on 9/20/88 I wrote Dr. Rangaraj a letter asking him if Ms. Patton had reached her maximum medical improvement at this time. Dr. Rangaraj has written a letter stating that if we agree to pay Ms. Patton's medical bills after she returns back to work relating to her work related injury that he saw no problems with her returning full time to a job such as garment inspection as previously reviewed on the job analysis given to him.
At trial, the Travelers adjuster, Boston, had this report but did not have a copy of Dr. Rangaraj's responses to Ms. Ritter's September 1988 inquiry. Ms. Ritter did not testify.
After terminating Mrs. Patton's weekly benefits, Travelers continued paying her medical expenses and receiving reports of her visits with Dr. Rangaraj. His report to Travelers of December 20, 1988 states in part:
Having difficulties with the left foot, although nowhere near what she used to have. Still having enough difficulties to the extent unable to sit, stand or do anything for more than a half hour without having to change position.... At this time with continued symptomatology of pain, it would be highly unlikely that she could be gainfully employed in any kind of occupation, even that of a sedentary type because the pain is persistent. If the current modalities [medication and physical therapy] do not work, might consider subjecting her to a lumbar sympathetic ganglion block.
Mrs. Patton next saw Dr. Rangaraj on January 3, 1989, still complaining of pain when sitting in any position for more than 30 minutes. He reported to Travelers in part:
I felt at that time it was the same continuing reflex dystrophy. Felt that this is probably the best she has been, and still lacks full medical improvement. Although at the present, I think she has kind of plateaued out, and continues to experience marked discomfort. My inclination would be to continue with the same medicines, if tolerated. And if her symptoms get worse, consider the sympathetic ganglion blockade.... And if she continues to be symptomatic, might consider a second opinion at either LSU Medical Center in Shreveport or New Orleans.
In his deposition when asked about Mrs. Patton's ability to return to work in March 1989, Dr. Rangaraj repeated his earlier recommendation that she first attempt part-time work before trying to work full-time. He explained that the 40 percent disability rating he reported to Conservco in October 1988 was a 40 percent disability of the body as a whole, based on his opinion that she had 100 percent impairment of the left leg. He admitted in his deposition that she did have some use of her leg and that the term "impairment" is not synonymous with inability to work, saying, "By no means does that mean that somebody that's got a leg that's broken can't work, even though that particular leg can be impaired."
At Travelers' request, Mrs. Patton saw Dr. Hand May 9, 1989. He then opined that she still had reflex sympathetic dystrophy and that she could perform either of the two jobs described on the job analysis forms submitted to him by Conservco in March 1988 (sewing machine operator or snap machine operator). Dr. Hand wrote this letter to the attorney for Travelers in June 1989:
Your request for further medical information on Betty Patton arrived today. I have reviewed the previous job descriptions which you refer to and I see no reason why she could not do either one of these jobs at this time.
As stated in my report of May 9, 1989, I find it difficult to put impairment rating on this condition; however, I do feel that 100% is probably too high and I would rate it no more than 50% with the understanding that improvement is expected.
In his deposition five days before trial, Dr. Hand said he would place no specific limitations on Mrs. Patton's activities, but "would tell her to avoid the activities that *869 aggravate her pain, whatever that might be."

TRIAL COURT FINDINGS
The trial court found Mrs. Patton did not prove she was totally disabled, either temporarily or permanently, but awarded her supplemental earnings benefits from September 27, 1988 for the allowable statutory period, on findings that the pain from her injury prevented her from earning wages equal to 90 percent or more of her wages at the time of her injury. LRS 23:1221(3)(a). Noting that Mrs. Patton was not "engaged in any employment or self-employment," the court correctly concluded defendants had the burden of proving that she was physically able to do work from which she could have earned wages that would reduce the amount of her supplemental earnings benefits, and that such work was tendered by the employer or was otherwise available within the community. § 1221(3)(c)(i); Gaspard v. St. Paul Fire & Marine Ins. Co., 483 So.2d 1037 (La.App. 3d Cir.1985). The court found defendants did not meet this burden.
The court denied penalties and attorney fees, finding that defendants acted reasonably in terminating benefits and later denying Mrs. Patton's claim for reinstatement of benefits "when faced with the equivocation of the treating physicians." As we shall demonstrate, the preponderance of the evidence is contrary to the trial court's conclusions in this respect. Rosell v. ESCO, 549 So.2d 840 (La.1989).

TEMPORARY TOTAL DISABILITY; MRS. PATTON'S CONTENTIONS
Mrs. Patton contends the trial court was clearly wrong in failing to find that she was temporarily totally disabled, either because of her substantial leg pain or because she is an "odd lot" employee. On this record, we do not agree with her contention.
In order to receive benefits for temporary total disability, a claimant must prove that she is unable to engage in any self-employment or gainful occupation for wages. § 1221(1); Brown v. Commercial Union Ins. Co., 548 So.2d 954 (La.App. 3d Cir.1989).
Dr. Rangaraj considered Mrs. Patton's inability to keep her leg in one position for more than 30-45 minutes without pain when he opined, in August 1988, that she could try part-time work in "some kind of sedentary job," which he defined as "a desk type job, with the ability to get up and move around a little bit." He expressed the same opinion of her ability to return to work in March 1989, when his deposition was taken. His interim opinion of December 1988 that she could not return to work, even at a sedentary job, is somewhat incongruous in the light of his finding that the difficulties she was then having were "nowhere near what she used to have." Her primary difficulty at that time, as on her earlier and later visits, was that she was unable to sit or stand for more than 30 minutes without changing positions. Dr. Rangaraj was not asked why that difficulty would have prevented her from working at all in December 1988 but would only have limited her to part-time work offering her the chance to move around in August 1988 and March 1989.
On this record, we cannot say the trial court was clearly wrong in concluding that Mrs. Patton did not prove that her leg pain prevented her from engaging in any employment after September 27, 1988. Compare Willie v. Balehi Marine, Inc., 525 So.2d 231 (La.App. 1st Cir.1988). Willie is factually distinguishable, as the doctors there made no reference to the plaintiff's subjective complaints of pain in their reports indicating he could return to work.
Mrs. Patton alternatively contends that she is an "odd lot" employee, based on the combination of her inability to stay in one position for very long and her lack of education or vocational training. She was 35 years old at trial. She quit school in the 11th grade and later earned a GED. Her only work experience between her 1971 marriage and her 1987 injury at Mini Togs was about three months of work as a sewing machine operator at a factory in Olla in 1973. She said she left that job "because I... didn't need to work and my husband *870 preferred that I didn't." These sparse facts do not allow us to draw the inference that the tasks and services Mrs. Patton is able to render, even with her leg pain, are so limited in quality, quantity or dependability that there is no reasonably available job market in which she can compete. While her leg pain will limit her employability in some jobs, she may work at a desk job where she can frequently stand up and move around to relieve her pain, as Dr. Rangaraj acknowledged. See and compare Kirkley v. DSI Transports, Inc., 416 So.2d 584 (La.App. 1st Cir.1982); and Jacobs v. Pik-Quick, Inc., 454 So.2d 303 (La.App. 4th Cir.1984).

SUPPLEMENTAL EARNINGS BENEFITS; DEFENDANTS' CONTENTIONS
Defendants contend Mrs. Patton is not entitled to SEB because she did not prove her pain was "substantial." Defendants rely on Dr. Hand's opinions in March 1988 and May 1989 that she could return to work as a sewing machine operator. Alternatively, defendants assert that even assuming she was unable to return to work as a sewing machine operator because of substantial pain, Mrs. Patton was tendered employment and could have worked as a "garment inspector."
Defendants' reliance on Dr. Hand's March 1988 opinion is misplaced at this juncture. Defendants did not rely on that report but continued to pay weekly benefits through September 1988, according to Boston, because of Dr. Rangaraj's April 1988, opinion that Mrs. Patton could not return to any type of work. Defendants terminated her weekly benefits only after receiving Dr. Rangaraj's August 15, 1988 report opining that Mrs. Patton could try part-time sedentary work, which would allow her to move around. The import of this opinion is that her leg pain prevented her from working full-time, even in a sedentary job, and from working part-time if she did not have the opportunity to move around. Mrs. Patton and her husband testified that she does not do as much housework as she did before her injury and that he sometimes completes cooking what she started because her standing while cooking causes her leg pain to increase.
From the medical and lay evidence about Mrs. Patton's pain, the trial court found that she had made a prima facie showing of partial disability, or inability to earn at least 90 percent of her former wages, under LRS 23:1221(3)(a). This finding is supported by the record and is not clearly wrong, notwithstanding that the trial court described Mrs. Patton's pain as "intermittent" and failed to use the word "substantial." The label is not sacramental. For claimants in Mrs. Patton's situation SEB benefits are owed even though temporary total benefits are not. See and compare Valley v. American Ins. Co., 510 So.2d 449 (La.App. 3d Cir.1987), writ denied, and Williams v. Avondale Industries, Inc., 521 So.2d 491 (La.App. 4th Cir.1988).
Supplemental earnings benefits are calculated as 66-2/3 percent of the difference between the employee's average monthly wage at the time of injury and the average monthly wages the employee earns or is able to earn thereafter. § 1221(3)(a). If the employee has not returned to work, the amount she is deemed able to earn is zero unless the employer proves that she was physically able to perform work that was tendered by the employer or was otherwise available to her in the community. § 1221(3)(c)(i); Brown v. Commercial Union Ins. Co., supra.
Dr. Rangaraj opined that Mrs. Patton could try to return to "some kind of sedentary job, such as garment inspector," on a part-time basis, in August 1988. Mr. Hakim of Mini Togs testified that Mrs. Patton was offered a job as a garment inspector but did not accept it because she did not want to work in the shipping department. Mrs. Patton testified that Mr. Hakim told her the position of garment inspector had been completely eliminated. Faced with this conflicting evidence, and no other evidence from defendants as to the availability of work elsewhere in the community within Dr. Rangaraj's limitations, the trial court found the defendants did not meet their burden of proof under § 1221(3)(c)(i). *871 This finding is supported by the record and is not clearly wrong. See Brown v. Commercial Union Ins. Co., supra.
We affirm the SEB award beginning September 27, 1988, without any reduction for the average amount she could have earned through the date of the trial. The record shows she did not work after her accident.

PENALTIES & ATTORNEY FEES
Here we consider whether the preponderance of the evidence in the record supports the trial court's finding that defendants "had probable cause or reason to discontinue [Mrs. Patton's] benefits ... [on September 27, 1988 and] they were not arbitrary in refusing to reinstate ... benefits when faced with the equivocation of the treating physicians."
The court considered the opinions of Drs. Hand and Rangaraj that were reported to defendants both before and after the September 1988 termination of benefits, in assessing the reasonableness of defendants' conduct. The court should not have considered medical opinions rendered after September 27, 1988, in determining whether the initial termination of benefits was arbitrary or without probable cause, because the contents of those opinions were not known to defendants when they decided to terminate. See Ainsworth v. Wells Lamont Corp., 499 So.2d 534 (La.App. 2d Cir.1986).
Mr. Boston of Travelers testified that the decision to terminate benefits was based in part on Dr. Hand's March 1988 opinion and in part on Dr. Rangaraj's August 1988 opinion, both of which we have summarized above. He also testified that Travelers continued paying weekly benefits after March 1988, notwithstanding Dr. Hand's opinion that Mrs. Patton could return to her former work. Boston explained that payment of benefits continued because of Dr. Rangaraj's April 1988 opinion that she could not work at all and because of Boston's May 1988 conversation with Mrs. Patton, in which she reported that she still had problems with her leg and could not stand or walk for very long without her leg swelling. This information was clearly contrary to Dr. Hand's optimistic assessment of Mrs. Patton's ability to return to work, which he made some five months after her last visit to him in October 1987. Under the circumstances that Mr. Boston explained, we must conclude that Travelers cannot avoid penalties and attorney fees for the September 1988 termination of benefits by asserting its reliance on Dr. Hand's opinion of March 1988. Ross v. St. Paul Fire & Marine Ins. Co., 556 So.2d 891 (La.App. 2d Cir.1990).
The only other medical evidence which conceivably could have been relied on by Travelers to terminate benefits was Dr. Rangaraj's August 1988 opinion that Mrs. Patton could try sedentary work on a part-time basis. While this may have given Travelers a basis to reasonably controvert Mrs. Patton's claim that she was totally disabled, as we have discussed in the section above on Temporary Total Disability, Dr. Rangaraj's opinion does not support Travelers' decision to deny supplemental earnings benefits for partial disability. See and compare Guillory v. Travelers Insurance Company, 294 So.2d 215 (La.1974) and Ainsworth v. Wells Lamont Corp., supra.
Dr. Rangaraj sent his medical reports of Mrs. Patton's visits after September 1988 to Travelers. Nothing therein indicates that he changed his opinion about Mrs. Patton's ability to return to work. While Dr. Hand repeated his earlier opinion that Mrs. Patton could return to work as a sewing machine operator in May 1989, he clearly said in his September 1989 deposition that she should avoid activities that aggravate her pain. Mrs. Patton has consistently stated, even in her May 1988 conversation with Mr. Boston of Travelers, that she has pain and swelling when she keeps her leg in one position for more than 30-45 minutes. To award SEB, the trial court had to find this as a fact. The record compels us to expressly make the conclusion impliedly made by the trial court that Mrs. Patton suffers disabling pain and swelling if she keeps her leg in one position for more than about 40 minutes.
*872 On this record, we must find that the trial court was clearly wrong in denying penalties and attorney fees, both for initially terminating benefits and subsequently refusing to reinstate benefits. See and compare Ainsworth v. Wells Lamont Corp. and Ross v. St. Paul Fire & Marine Ins. Co., both cited supra.
We assess against Travelers statutory penalties of 12 percent on each unpaid SEB installment since September 27, 1988. Mini Togs is not assessed because there is no evidence that Mini Togs "was at fault in causing the delay." LRS 23:1201 E. We also assess Travelers with $5,000 as a reasonable attorney's fee for Mrs. Patton's representation before and during her one-day trial, for answering the appeal, and for briefing and orally arguing the case here. § 1201.2.

DECREE
We amend the judgment against only Travelers to award statutory penalties of 12 percent on each unpaid installment of supplemental earnings benefits and to award attorney fees of $5,000. We affirm the judgment as amended and assess cost to defendants.
AMENDED AND AFFIRMED.