614 So.2d 820 (1993)
George L. HINTON, Plaintiff-Appellant,
v.
SCOTT HYDRAULICS, INC., Defendant-Appellee.
No. 24464-CA.
Court of Appeal of Louisiana, Second Circuit.
February 24, 1993.
Writ Denied April 30, 1993.
*822 Bailey & Dawson by Jack Bailey, Shreveport, for plaintiff-appellant.
Wiener, Weiss, Madison & Howell by Larry Feldman, Jr., Shreveport, for defendant-appellee.
Before NORRIS, STEWART and WILLIAMS, JJ.
STEWART, Judge.
George L. Hinton appeals the dismissal of his workers' compensation claim against his employer, Scott Hydraulics, Inc. Hinton contends that the administrative hearing officer erred in her determination that Hinton had already received the proper amount of compensation to which he was entitled for his injury. He claims entitlement to temporary total disability benefits and/or supplemental earnings benefits (SEB), and rehabilitation benefits, pursuant to LSA-R.S. 23:1221(1), 23:1221(3), and 23:1226, respectively. We reverse.

FACTS
George Hinton was employed by Scott Hydraulics, Inc. as a welder. In July 1988, his wages were $10 per hour and he averaged $400 per week. On July 13, 1988, Hinton sustained an injury in the course of his employment. The injury caused pain in his shoulders. He sought medical treatment soon thereafter but continued to work at Scott Hydraulics until January 4, 1989 when he could no longer work due to the injury. After further medical treatment, as well as arthroscopic surgery on each shoulder, Hinton was released to return to work on January 22, 1990 by his treating physician and his physical therapist. However, Hinton's position had been filled and Scott Hydraulics did not re-hire him. Scott Hydraulics paid Hinton workers' compensation benefits from January 4, 1989 until January 22, 1990. Hinton sought other welding jobs, but could not find one. On May 19, 1990 he began work at minimum wage ($3.80) as a security guard with Vinson Guard Service, Inc.
The administrative hearing officer specifically found that Hinton's July 13, 1988 accident caused him temporary total disability from January 3, 1989 through January 22, 1990. She also found that Hinton was physically able to return to his previous employment after January 22, 1990. The hearing officer determined that Hinton's discharge from employment was caused by economic necessity to fill his position, and was not retaliation. In accordance with her conclusion that Hinton had received the proper amount of compensation for his injury, she dismissed his claim with prejudice.
Hinton appeals, asserting that the hearing officer committed manifest error by (1) failing to award rehabilitation benefits, (2) failing to award temporary total disability benefits from January 22, 1990 until May 19, 1990, and (3) failing to award supplemental earnings benefits from January 22, 1990, based upon zero earning capacity prior to May 19, 1990 and thereafter based upon minimum wage.

DISCUSSION
With the exception of temporary total disability benefits, we agree with Hinton's assignments of error.

Temporary Total Disability Benefits
In order to receive benefits for temporary total disability, a claimant must prove, by a preponderance of the evidence, that he is unable to engage in any self-employment or gainful occupation for wages. LSA-R.S. 23:1221(1); Patton v. Mini-Togs, Inc., 575 So.2d 864, 869 (La. App.2d Cir.1991), writ denied, 578 So.2d 140 (La.1991); Brown v. Commercial Union Ins. Co., 548 So.2d 954 (La.App. 3d Cir. 1989). The medical evidence indicated that Hinton could engage in some form of employment beginning on January 22, 1990. Hinton sought employment from January 29, 1990 until he was hired a few months later as a security guard. At the time of trial, Hinton was still employed as a security *823 guard. His employer testified by deposition that Hinton was an excellent worker. Thus, Hinton failed to carry his burden to prove by a preponderance of the evidence that he was temporarily, totally disabled as defined by R.S. 23:1221. The hearing officer properly denied benefits for temporary total disability.

Supplemental Earnings Benefits
By dismissing Hinton's claims, the hearing officer denied his claim for supplemental earnings benefits. The claimant in an SEB case must prove by a preponderance of evidence that his work-related injury rendered him unable to earn 90 percent of his pre-injury wages. Lubom v. L.J. Earnest, Inc., 579 So.2d 1174 (La. App. 2d Cir.1991); Barton v. Wausau Ins. Co., 545 So.2d 1248 (La.App. 2d Cir.1989). To determine whether the claimant has established a prima facie case for entitlement to SEB, the court must consider whether he presented sufficient evidence to prove he was unable to earn the requisite percentage of his pre-injury wages. Mills v. Guaranty Industrial Contractors, Inc., 557 So.2d 326 (La.App. 4th Cir.1990); Williams v. Avondale Indus., Inc., 521 So.2d 491 (La.App. 4th Cir.1988). Once the SEB claimant establishes his prima facie case, the burden shifts to the employer to show that the claimant is physically capable of work that paid at 90 percent or more of his pre-injury wages and that such work was offered or available in the claimant's reasonable geographic region. Lubom, Mills, and Barton, all supra.
At issue is whether Hinton sustained his burden of prima facie proof by a preponderance of evidence that his work-related injury rendered him unable to earn 90% of his pre-injury wages, such that the trier of fact's decision to not award SEB is clearly wrong. Cassard v. American General Fire & Casualty Co., 568 So.2d 1151 (La. App. 5th Cir.1990) at 1155 citing Daigle v. Sherwin-Williams Co., 545 So.2d 1005 (La. 1989); also, compare Lott v. Reintjes Industrial Services of Louisiana, Inc., 540 So.2d 472 (La.App. 1st Cir.1989) at 476.
In a suit for workers' compensation benefits, the trier of fact should accept the uncontradicted testimony of a witness, even if the witness is a party, unless there are circumstances which otherwise cast doubt on its reliability. Moore v. Mason & Dixon Tank Lines, 540 So.2d 525, 529 (La. App. 1st Cir.1989), writ denied, 541 So.2d 1390 (La.1989). The trier of fact should take into account all factors which might bear on his ability to earn a wage. Cassard, supra; Daigle v. Sherwin-Williams Co., 545 So.2d 1005 (La.1989). The opinion of a physician or other medical expert about disability does not necessarily determine legal disability. Johnson v. Ins. Co. of N. America, 454 So.2d 1113, 1117 (La. 1984).
Hinton was a manual laborer who had been trained, by experience, as a welder. Even though he had a ninth grade education, he could neither read a newspaper nor write well enough to fill out a job application. The record shows that the job Hinton found pays minimum wage ($3.85 per hour at the time of the March 13, 1990 trial). This amount is less than 90 percent of the $10 per hour which he earned at Scott Hydraulics.
Paul Procell, an occupational therapist, signed the report from the Work Hardening Program. Procell indicated that Hinton could (1) occasionally lift or carry up to 50 pounds, (2) frequently lift 30 pounds, and (3) constantly lift 10 pounds. Although arthroscopic surgery had been performed on both of Hinton's shoulders, the conclusions of the January 18, 1990 report (which indicated Hinton could return to work as of January 22, 1990) were based upon the left upper extremity. Procell's report notes a visit to Scott Hydraulics to determine the work requirements for a welder, but does not state whether this information was obtained from welders or from administrative/managerial personnel. Procell did not testify either at trial or by deposition.
Hinton's treating physician, Dr. Edwards, accepted the recommendations of the physical therapist at the work-hardening program to which Edwards had referred *824 Hinton. Dr. Edwards released Hinton to work, effective January 22, 1990. Dr. Edwards indicated in a document dated February 18, 1990 that Hinton was to lift no more than 50 pounds. Dr. Edwards also drafted a letter dated May 8, 1990 which stated that Hinton was to do no reaching above shoulder level.
At trial, Hinton described in detail the work required of him as a welder at Scott Hydraulics. R.p.156:
Q. When you would do the welding work, did it ever require you to work over your shoulder?
A. Yes, it did.
Q. Can you explain to us what you had to do and why it was required to work over your shoulder level?
A. Well, we had one in over there that a part of it up inside of it where it does the turning in there had broken. And after the I guess you'd call it the elbow arm part, the boom part, is the actual name for it, if youafter we took that off, got that off and out of the way, then we took the whole head part off. They pulled it out and machined the part, put it back in there and I had to weld it. And the only way you could get to weld it was stand in between the frame and the wheel and you had to reach up in there.
Q. So, by saying reach up in there, you're talking about overhead?
A. Overhead. Because when you stand on the ground and you're looking up at it, it's up overhead. And you couldn't climb up on it and weld it because of the way it's made, it's up inside about thatI'd say three inches up inside of the housing part. And the only openings you had is on each side. And you have to weld a certain part of it and turn it; weld it, turn it, where you could weld it all the way around.
Q. And how long would that take you?
A. Sometimes it would take as long as two hours, maybe three hours.
....
R.p. 157:
Q. Explain to us why you had to do overhead welding if these machines were in the shop yard.
A. Well, a lot of times the way the equipment was set up and where it was, you had to do overhead welding. You couldn't get up and do it flat. You get up on the bed of the truck and it's still up above your head. Sometimes there would be a situation to where there was a section going to be cut out of the boom after it was, part of it was taken out, the last part that was on the truck was the part that was going to be cut off. Climb up on top of it and you cut it so far on each side, and then you get on the bottom and cut it. You get it cleaned up and everything, and when you get ready to weld it, the parts go back in, you've got to stand on the bottom, weld part of it anyway. And that's overhead.
....
R.p. 158:
Q. When you would do work on these trucks related to hydraulics, did that require you to do any type of overhead work?
A. Yes.
Q. Explain to us what you had to do and why it was required to do it overhead.
A. Okay. You've gotwell, for instance, we'll use a truck that hauls brick. They've got a hydraulic system set up with a boom on it to where they can pick up a whole pad of bricks at one time and set up there. And it sets on a platform on one end, on the other end it's on the boom part is on a steady rest. And when it comes in there, if there's some hoses that are messed up on it, that's overhead. You got to fix it overhead or you got to climb up and try to hang up in the air. And it's easier to do it standing on the truck and reach up and do it.
Q. How often did you do that type of work?
A. It's hard to say. I mean, it may be one might come in in six months and it might be one come in, say, three times a month.
*825 In an effort to prove that Hinton was physically capable of welding work, appellee attempted to show that the welding job was not as demanding as Hinton described in his testimony. However, appellee's witnesses did not have first-hand knowledge of what its welders did every day. There was no testimony from a welder other than Hinton. Likewise, there was no testimony, from anyone familiar with welding duties, which indicated that Hinton could do the work. Although there are some inconsistencies between Hinton's description and that of appellee's witnesses, Hinton's testimony about his duties is uncontradicted.
Appellee tendered Thomas W. Matthews as its expert witness. However, Matthews was not a certified vocational counselor and was not accepted as an expert. Matthews testified that he had reviewed a file given to him, talked with Dr. Edwards, and performed a labor market survey. Each of the jobs described in the survey (telephone solicitor, pizza delivery, construction flagger, and newspaper carrier) would require literacy. On this record, appellee Scott Hydraulics failed to show that Hinton was capable of work which paid at least 90 percent of his pre-injury wages and which was offered or available. See Moore, supra.
Hinton also testified that he experienced pain as a security guard as follows:
R.p. 174:
Q. Have you had any problems because of your injury and surgery, on this security guard job?
A. Yeah, I do. There's two gates that I have to pull to that they don't swing, they roll. They're long gates on a roller. And every evening when I have toof course, they roll relatively easy. But I have problems getting them to start rolling. Sometimes I have to go down there and put my foot against it and push it with my foot to get it to going. And it's a double gate, it comes in like this, you got one on each side. You have to pull those two [sic] and lock them. The other gates, they swing, but when you go down there and pull them two [sic], I try to pull them and get them going where I can get to it and it won't cause so much pain. But it makes me hurt.
Q. Mr. Hinton, do you think that you could have gone back to Scott and worked in that same job like you used to?
A. Right now, I'd have to say no.
Q. And why?
A. Why?
Q. Yes.
A. Because of me hurting, with my neck hurting like it does. I still have problems with a lot of my motion in my arm. When I went back over there, I felt like I could. I wanted the chance to try. But I didn't get that chance.
There is no question that, prior to the work-related injury, Hinton could perform his duties as a welder as well as other manual labor and that, after the injury, Hinton's ability to do manual labor, specifically lifting heavy loads and reaching above shoulder level, was restricted. Likewise, it is uncontradicted that Hinton continues to experience pain and that he cannot perform some of the activities which he had performed at Scott Hydraulics.
The record contains neither evidence that Hinton can perform the duties of a welder, nor evidence of any offered or available employment which is consistent with Hinton's capabilities and which pays at least 90 percent of his pre-injury wages. Accordingly, we find that Hinton's educational level, work restrictions and pain combine to entitle him to SEB. Hinton established a prima facie case of entitlement to SEB, but appellee failed to rebut that evidence. The hearing officer was clearly wrong in determining that the evidence does not preponderate in Hinton's favor.

Calculation of SEB
Hinton requests that SEB be calculated based on zero earning capacity between the time he was released to return to work and the time he began working for Vinson. However, Hinton has not shown that he was unable to earn any wages during that time period. While we find *826 that he has shown his inability to earn 90 percent of the $10.00 per hour ($400.00 per week) which he had earned as a welder, we recognize that there is no evidence that Hinton could earn no wages during this time period. We therefore find that Hinton was able to earn minimum wage between January 22, 1990 and May 18, 1990. Accordingly, SEB shall be calculated based on his capacity to earn minimum wage beginning with the January 22, 1990 date of his release to return to work. See Clark v. Atlantic Painting Co., 521 So.2d 505, 509-510 (La.App. 4th Cir.1988).
LSA-R.S. 23:1221(3)(a) provides the formula for calculating SEB as follows:
For injury resulting in the employee's inability to earn wages equal to ninety percent or more of wages at time of injury, supplemental earnings benefits equal to sixty-six and two-thirds percent of the difference between the average monthly wages at time of injury and average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment.... Average monthly wages shall be computed as four and three-tenths times the wages as defined in R.S. 23:1021(10).
The parties stipulated that Hinton's average weekly pre-injury wage was $400. His average monthly pre-injury wage was thus $1,720 ($400 × 4.3 = $1,720). Vinson's payroll records show that he was paid $3.80 per hour from May 19, 1990 until November 17, 1990 and $3.85 per hour from November 17, 1990 until March 1991. Based upon minimum wage at forty hours per week for the four months from January 22, 1990 until May 18, 1990 (while Hinton sought employment), and for the six months from May 19, 1990 to November 17, 1990,[1] we calculate as follows:

40 hours × $3.80 = $152 weekly
$152 × 4.3 = $654 monthly
$1,720-$654 = $1,066
$1,066 × 662/3% = $711 per month
$711 × 10 months = $7,110 for 1/22/90 to 11/17/90

Between November 17, 1990 and April 1, 1991,[2] Hinton was paid $3.85 hourly. The SEB calculation is as follows:

40 hours × $3.85 = $154 weekly
$154 × 4.3 = $662 monthly
$1,720-$662 = $1,058
$1,058 × 66 2/3% = $705 per month
$705 × 4.5 months = $3,173 for 11/17/90 to 3/31/91

Beginning April 1, 1991, we calculate as follows:

40 hours × $4.25 = $170 weekly
$170 × 4.3 = $731 monthly
$1,720-$731 = $989
$989 × 66 2/3% = $659 per month beginning 4/91

*827 Rehabilitation Benefits

When an employee has suffered a work-related injury which precludes the employee from earning wages equal to those earned prior to the injury, the employee is entitled to prompt rehabilitation services. LSA-R.S. 23:1226.
An employee is entitled to rehabilitation if his injury reasonably precludes him from earning wages equal to those earned prior to the injury. If the injury is such that employment at similar wages is not reasonably attainable, then the employee has met his burden and is entitled to rehabilitation services. Frazier v. Conagra, Inc., 552 So.2d 536 (La.App. 2d Cir. 1989), writ denied, 559 So.2d 124 (La.1990).
We have already found that Hinton proved his inability to earn 90 percent of his pre-injury wages. Hinton and his wife testified that he began to seek employment in January 1990. In May 1990, he accepted the first job offer he received and he continues to seek employment. Out of approximately 30 job applications, Hinton received only the offer of employment at minimum wage as a security guard. There is no evidence which shows that he can reasonably attain employment at wages similar to that he earned with appellee. On this record, we find that Hinton is entitled to rehabilitation benefits under LSA-R.S. 23:1226A. The hearing officer was clearly wrong in dismissing Hinton's claim for rehabilitation services. Accordingly, we remand this case for additional evidence to allow the hearing officer to evaluate available rehabilitation services and to determine what services are appropriate for Hinton. See Frazier, supra.

CONCLUSION
The hearing officer properly found that Hinton failed to prove entitlement to temporary total disability benefits. However, the hearing officer was clearly wrong in dismissing his claim for supplemental earnings benefits and rehabilitation benefits. We reverse the judgment entered by the hearing officer and award supplemental earnings benefits to Hinton beginning January 23, 1990.
Judgment is hereby rendered in favor of plaintiff George Hinton and against the defendant Scott Hydraulics. Scott Hydraulics shall pay to George Hinton supplemental earnings benefits in accordance with the calculations herein, for a period not to exceed the 520 week maximum provided by LSA-R.S. 23:1221(3)[3], together with legal interest on each past due benefit from its respective due date.
The case is remanded for additional evidence on the issue of rehabilitation and for a determination consistent with this opinion. Costs of this appeal are assessed against appellee.
REVERSED, RENDERED IN PART AND REMANDED.
NOTES
[1] Vinson's payroll records for Hinton show that some weeks he worked more than forty hours and some weeks he worked less than forty hours. We therefore assume an average work week of forty hours for the purposes of these calculations.
[2] In brief, counsel for Hinton states the following:

Although counsel is without personal knowledge concerning Mr. Hinton's wages since the time of trial, it is assumed that he has been paid the minimum wage of $4.25 per hour since April 1, 1991, as required by federal law.
Accordingly, we assume that Hinton's wages were increased to $4.25 per hour on April 1, 1991.
[3] As this court noted in Woolsey v. Cotton Brothers Bakery Co., 535 So.2d 1119, 1127 (La.App. 2d Cir.1988), writ denied, 537 So.2d 1168 (La.1989).

Plaintiff is entitled to supplemental earnings benefits for the duration of his disability, subject to the statutory limitations on recovery. LRS 23:1221(3). The statute allows recovery of supplemental earnings benefits for no more than 520 weeks but gives conditions under which they may be terminated sooner. Not knowing when or if these conditions will arise, we cannot award benefits for 520 weeks, as plaintiff asks.
For this reason, we do not set a specific length of benefits for the time period subsequent to trial.