954 So.2d 276 (2007)
Kimberly LEE, Plaintiff-Appellant
v.
HERITAGE MANOR OF BOSSIER CITY, Defendant-Appellee.
No. 41,828-WCA.
Court of Appeal of Louisiana, Second Circuit.
March 14, 2007.
*278 Fischer & McMahon, by Mark Kenneth Manno, for Appellant.
Rabalais, Unland & Lorio, by John Joseph Rabalais, Paul Eric Harrison, Covington, Heather W. Blackburn, for Appellee.
Before CARAWAY, DREW and SEXTON (Pro Tempore), JJ.
DREW, J.
In this workers' compensation case, the employee appeals a judgment denying her claims for post-termination Supplemental Earning Benefits ("SEBs"), cervical disc surgery, and additional penalties and attorney fees.
*279 We affirm the judgment in part and reverse the judgment in part.

FACTS
Kimberly Lee was employed as a Certified Nursing Assistant and van driver at Heritage Manor nursing home. Lee injured her cervical spine on April 27, 2004, when she moved a nursing home resident from his bed to a chair.
Following the incident, Lee was treated by her regular physician, Dr. Carter Boyd, on May 3, 2004. Dr. Boyd noted that Lee had injured her neck and was experiencing pain down her spine and numbness in both legs, with the right leg worse. A cervical spine MRI taken on May 11, 2004, revealed degenerative disc disease mostly at C5-6 and C6-7, with C5-6 as the most affected. A lumbar spine MRI was normal.
Dr. Boyd referred Lee to Cornerstone Rehabilitation, where she received a Functional Capacity Evaluation ("FCE") on July 1, 2004, and was evaluated on July 15, 2004. The summary of findings from the FCE was that Lee was unable to do the lifting or carrying as noted in her job description, but was able to perform at a light to medium work level. Lee received therapy at Cornerstone through August 20, 2004. The discharge note from Cornerstone states that Lee only reported intermittent lower back pain every other day while at rest, had no complaints that day of pain in neck or back, and could perform her pre-injury job with minimal to no complaints. All physical therapy goals had been met.
Dr. Boyd's notes from September 8, 2004, reflect that Lee's cervical condition had resolved, but she continued to complain of back pain. Dr. Boyd recommended pain management.
Lee continued to work after the accident. However, Dr. Boyd took Lee off of work near the end of September of 2004. She began receiving indemnity payments the next month.
On October 15, 2004, Lee was examined by Dr. William Whyte on a referral from Dr. Boyd. According to Dr. Whyte's records, Dr. Boyd had requested a non-surgical interventional spine consultation. Lee described pain in the neck that radiated into the left upper extremity, with the pain described as stabbing, burning, and sharp. Dr. Whyte's diagnosis was left C6 radiculopathy, and left C5-6 "herniated nucleopulpsis extending into left neuroforamin [and] partially obstructing foramen." Dr. Whyte wanted to pursue a C5-6 percutaneous disc decompression (nucleoplasty).
On a referral from Dr. Boyd, Lee began treatment with orthopedic surgeon Dr. Pierce Nunley on November 11, 2004. Dr. Nunley prescribed physical therapy, which Lee began at Tri-State Physical Therapy on November 22, 2004. Physical therapy records from December 15, 2004 reflect that there was a decrease in complaints of neck pain.
EMG and nerve conduction studies were performed by Dr. David Adams on December 2, 2004, at the request of Dr. Nunley. There was no evidence of radiculopathy, neuropathy, or myopathy in either lower extremity. None of those conditions or ulnar neuropathy was found in either upper extremity.
After a rehabilitation conference, Dr. Nunely noted on December 29, 2004, that it was reasonable for Lee to be at light-duty work at that time. On January 3, 2005, Dr. Nunley wrote regarding Lee's work status that she was to be restricted to light-duty desk-type work, with no lifting, pulling, or pushing more than 10 pounds either occasionally or on a repetitive basis. Lee was also not to do repetitive *280 tasks and was to be allowed frequent position changes. Dr. Nunley also reviewed the MRIs from May 2004. He thought there was disc herniation at C5-6, and degenerative disc disease at C4-5, C6-7, L3-4, L4-5, and L5-S1. Regarding the lower back, Dr. Nunley thought that conservative management should be continued. Regarding the neck, Dr. Nunley recommended bilateral C6 nerve root blocks and, depending on their effectiveness, an Anterior Cervical Discectomy and Fusion ("ACDF").
On January 12, 2005, Lee's case manager wrote to Dr. Nunley about Lee's modified job description. Her duties were to include, but not be limited to, answering phones, passing out dinner trays and snacks to residents, feeding residents, filling water pitchers, answering call bells, trimming residents' nails, brushing residents' teeth, checking closets for neatness, assisting with chart filing, cleaning wheelchairs, bathing residents, and pushing residents in wheelchairs. No duty required lifting, pulling, or pushing more than 10 pounds. Dr. Nunley approved the job description, except that he wanted no transferring of residents or duties which required supporting a resident's weight.
Lee was involved in a motor vehicle accident on January 26, 2005. She stopped receiving indemnity payments the next day. When Lee was treated at Dr. Nunley's office on February 3, 2005, she reported that the nerve blocks relieved some of the pain, but she was never pain-free. Lee also complained that her pain had increased after the recent motor vehicle accident.
An MRI of Lee's cervical spine was performed on February 3, 2005. The radiologist's impression was a very small central disc protrusion at C5-6 having minimal effect on the thecal sac, and mild to moderate degenerative disc changes at C4-5 without significant narrowing of the nerve root canals. Dr. Nunley believed this MRI showed disc bulge and spondylosis at C4-5, a herniated disc "eccentric to the left" at C5-6, and mild degenerative disc disease at C6-7.
Lee returned to light-duty work on February 10, 2005. On that date, Lee and Heritage Manor's Administrator Joel Marsh signed off on her job restrictions. Her duties were largely identical to those listed in the January 12, 2005, modified job description, except that none of her duties were to include lifting anything weighing more than 10 pounds; lifting, transferring or pushing residents; or bathing, changing, or doing anything that required her to support any part of a resident's weight.
Lee stopped receiving physical therapy at Tri-State on February 14, 2005. The notes from her last physical therapy session state that Lee was tolerating work duties, and that all complaints of pain had increased since her motor vehicle accident.
Lee reported to Dr. Nunley's nurse on February 28, 2005, that the bilateral C6 selective nerve root block took away the majority of her symptoms, but that she still had occasional pain radiating to the right shoulder and primarily down the left shoulder. However, on March 24, 2005, Lee reported to Dr. Nunley's nurse that three C6 selective nerve root blocks had not helped alleviate any of her symptoms and that she wanted surgery. She was having pain equally on both sides. The nurse stated that he was submitting for approval of an ACDF C4-5 and C5-6.
Lee was fired on April 13, 2005. The reasons given for her termination were excessive absenteeism and insubordination. According to her employment records, Lee was absent from work approximately 13 times in 2005, usually to care for her sick child. In the months of February and *281 March of that year, Lee had worked approximately 16 days. Her employment records also reflect that Heritage Manor had instituted corrective actions plans for Lee several times when she returned to work in 2005. The reasons given for the corrective actions included not calling in daily to check with her supervisor, exhibiting lack of respect, insubordination, refusing to follow instructions, raising her voice, slamming a door shut, not doing her job, poorly performing her job, and having a poor attendance record.
On May 2, 2005, Lee was taken off of work by Dr. Nunley's office because of neck and lower back pain. On May 18, 2005, Lee amended her earlier filed claim for compensation to seek SEBs from February 10, 2005, to April 15, 2005, post-termination SEBs with a zero earnings base from April 16, 2005, through May 1, 2005, and temporary total disability benefits beginning on May 2, 2005. Surgery, penalties, and attorney fees were sought in later amendments.
Lee's complaints of pain continued. On June 2, 2005, she told Dr. Nunley's nurse that she still had low back pain, but her neck was worse. On June 30, 2005, Lee reported to Dr. Nunley's nurse that she had worsening symptoms in the base of her neck, radiating down her shoulders and into her hands. Lee also said that her back symptoms had worsened.
Dr. Gordon Mead, an orthopedic surgeon, evaluated Lee on June 20, 2005, for a second medical opinion. Dr. Mead disagreed with Dr. Nunley's recommendation of surgery. Dr. Mead considered Lee to be at maximum medical improvement, and he recommended that she undergo a functional capacity evaluation and be returned to the workforce.
An independent medical examination was sought by Heritage Manor. This examination was conducted by orthopedic surgeon Dr. Karl Bilderback on January 16, 2006. He concluded that in the absence of evidence of cervical or lumbar radiculopathy or cervical or lumbar segmental instability, he would not recommend any type of spine operation on Lee. Dr. Bilderback believed that Lee had reached maximum medical improvement regarding her April 2004 injuries, and that she could return to work in a medium work capacity and would likely advance to unrestricted work. He did not see any evidence of permanent impairment.
The WCJ rendered judgment finding that: (1) Lee was entitled to $188.97 in past-due benefits because Heritage Manor had underpaid benefits of $432.85 from October 15, 2004, through January 27, 2005, but had overpaid benefits of $243.88 from October 1, 2004, to October 15, 2004; (2) Lee is entitled to a penalty of $2,000.00 and attorney fees of $2,000.00 because of Heritage Manor's failure to properly calculate the average weekly wage; (3) Lee is not entitled to the ACDF surgery recommended by Dr. Nunley; (4) although Lee was asked to perform job duties beyond her restriction, she is not entitled to post-termination SEBs because she did not make a prima facie case that she could not earn 90% of her pre-injury wages; (5) Lee waived her claim to pre-termination SEBs; (6) Lee was not entitled to temporary total disability benefits because the off-work slip dated May 2, 2005, did not rise to the level of clear and convincing evidence in light of other medical evidence that Lee was capable of employment; and (7) Lee was not entitled to penalties or attorney fees for Heritage Manor's failure to approve the surgery or to obtain a second medical opinion within 60 days because Lee missed a scheduled second medical opinion examination.
Lee has appealed, arguing that the trial court erred in denying her claim for post-termination *282 SEBs, failing to award penalties and attorney fees on the SEBs issue, ordering an independent medical exam, denying her claim for cervical disc surgery, failing to award penalties and attorney fees for a late second medical opinion examination, and in awarding only $2,000.00 in attorney fees as a result of Heritage Manor's miscalculation of benefits.

DISCUSSION
Supplemental Earnings Benefits
Factual findings in workers' compensation cases are subject to the manifest error or clearly wrong standard of appellate review. Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 (La.7/1/97), 696 So.2d 551. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Id. When there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed even though the appellate court may feel that its own inferences and evaluations are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993).
SEBs are awarded when a work-related injury prevents the employee from earning 90% or more of his pre-injury wages. La. R.S. 23:1221(3)(a). The employee has the initial burden of proving, by a preponderance of the evidence, that the injury resulted in his inability to earn that amount under the facts and circumstances of the individual case. Banks, supra. "Th[is] analysis is necessarily a facts and circumstances one in which the court is mindful of the jurisprudential tenet that workers' compensation law is to be liberally construed in favor of coverage." Daigle v. Sherwin-Williams Co., 545 So.2d 1005, 1007 (La.1989). See Seal v. Gaylord Container Corp., 97-0688 (La.12/2/97), 704 So.2d 1161, and Kahlden v. Horseshoe Entertainment, 30,277 (La.App.2d Cir.2/25/98), 709 So.2d 873.
Once the employee's burden is met, the burden shifts to the employer who, in order to defeat the employee's claim for SEBs or establish the employee's earning capacity, must prove, by a preponderance of the evidence, that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employer's community or reasonable geographic region. La. R.S. 23:1221(3)(c)(i); Daigle, supra. Actual job placement is not required. Banks, supra.
The trial court specifically found that Lee was unable to perform her pre-injury job and that after she returned to work in February of 2005, Lee was asked to perform job duties that were beyond her job restrictions. That was enough for Lee to establish her prima facie case of entitlement to post-termination SEBs, and to shift the burden to Heritage Manor. It is of no moment that Lee was fired from her adjusted position because that position required tasks that exceeded her job restrictions.
Once Lee established her prima facie case of entitlement to SEBs, the burden of proof then shifted to Heritage Manor. The supreme court has set forth a minimum standard that an employer must meet in order to defeat a claim for SEBs by establishing job availability:

*283 [A]n employer may discharge its burden of proving job availability by establishing, at a minimum, the following, by competent evidence:
(1) the existence of a suitable job within claimant's physical capabilities and within claimant's or the employer's community or reasonable geographic region;
(2) the amount of wages that an employee with claimant's experience and training can be expected to earn in that job; and
(3) an actual position available for that particular job at the time that the claimant received notification of the job's existence.
Banks, 96-2840 at pp. 10-11, 696 So.2d at 557.
Heritage Manor failed to meet its burden. Other than the nursing home position offered that ultimately exceeded her job restrictions, Heritage Manor presented no evidence at trial that Lee was physically able to perform a certain job and that the job was offered to her or that the job was available to the Lee in her or Heritage Manor's community or reasonable geographic region. Accordingly, the trial court was clearly wrong in denying Lee's claim for post-termination SEBs. See Wilson v. Grosjean Contractors, Inc., 28,831 (La.App.2d Cir.10/30/96), 682 So.2d 1264, writ denied, 97-0012 (La.2/7/97), 688 So.2d 510, where the claimant was entitled to SEBs when the record contained neither evidence that the claimant could perform his previous job duties nor evidence of any offered or available employment consistent with his capabilities and which paid at least 90% of his pre-injury wages. See also Hinton v. Scott Hydraulics, Inc., 614 So.2d 820 (La.App. 2d Cir.1993), writ denied, 618 So.2d 413 (La.1993).
The method of determining the amount of an award of SEBs is provided in La. R.S. 23:1221(3)(a):
For injury resulting in the employee's inability to earn wages equal to ninety percent or more of wages at time of injury, supplemental earnings benefits equal to sixty-six and two-thirds percent of the difference between the average monthly wages at time of injury and average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of the injury was particularly fitted by reason of education, training, and experience, such comparison to be made on a monthly basis. Average monthly wages shall be computed by multiplying his "wages" by fifty-two and then dividing the quotient by twelve.
The WCJ determined that Lee's average weekly wage is $329.60, giving her an average monthly wage of $1,428.27. Heritage Manor presented no evidence as to the amount that Lee is able to earn in another position. Nevertheless, there is no evidence that Lee is unable to earn any wages. Therefore, her SEBs shall not be calculated based upon zero earning capacity. Instead, her SEBs are to be based upon the difference between her pre-injury monthly wage of $1,428.27 and the average monthly minimum wage of $892.66 ($5.15 per hour and assuming an average work week of 40 hours) that Lee would be capable of earning. See Wilson, supra, and Hinton, supra. We conclude that Lee is entitled to monthly SEBs of $357.00 beginning from April 13, 2005, her date of termination.
La. R.S. 23:1201(F) provides for the assessment of a penalty and reasonable *284 attorney fees against the employer or insurer for the failure to timely commence or timely continue paying benefits unless the claim is reasonably controverted or if the nonpayment results from conditions over which the employer or insurer had no control. The meaning of "reasonably controverted" in the context of this statute was addressed in Brown v. Texas-LA Cartage Inc., 98-1063, p. 9 (La.12/1/98), 721 So.2d 885, 890:
In general, one can surmise from the plain meaning of the words making up the phrase "reasonably controvert" that in order to reasonably controvert a claim, the defendant must have some valid reason or evidence upon which to base his denial of benefits. Thus, to determine whether the claimant's right has been reasonably controverted, thereby precluding the imposition of penalties and attorney fees under La. R.S. 23:1201, a court must ascertain whether the employer or his insurer engaged in a nonfrivolous legal dispute or possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant throughout the time he refused to pay all or part of the benefits allegedly owed.
Awards of penalties and attorney fees in workers' compensation cases are essentially penal in nature, being imposed to discourage indifference and undesirable conduct by employers and insurers. Williams v. Rush Masonry, Inc., 98-2271 (La.6/29/99), 737 So.2d 41; Sharbono v. Steve Lang & Son Loggers, 97-0110 (La.7/1/97), 696 So.2d 1382. Although the Workers' Compensation Act is to be liberally construed in regard to benefits, penal statutes are to be strictly construed. Williams, supra.
As noted above, other than medical records and providing a modified position to Lee, Heritage Manor failed to come forth with evidence to rebut Lee's claim to SEBs. At the time that Lee became entitled to SEBs, she had yet to be examined by Dr. Mead or Dr. Bilderback, and Heritage Manor was only aware that Lee could work with restrictions. Thus, the claim was not reasonably controverted. We note that Dr. Mead's recommendation was that a FCE be performed and Lee be returned to the workforce. Heritage Manor did not take these steps. Accordingly, we conclude that as a result of Heritage Manor's failure to pay SEBs, an additional penalty of $2,000.00 and additional attorney fees of $2,000.00 is appropriate.
Independent Medical Examination
La. R.S. 23:1123 states, in part, "If any dispute arises as to the condition of the employee, the director, upon application of any party, shall order an examination of the employee to be made by a medical practitioner selected and appointed by the director." Lee argues that the WCJ erred in ordering an Independent Medical Exam ("IME") when the dispute was not about Lee's condition, but whether she needed surgery. Lee additionally contends that because the IME was improper, its conclusions should not have been considered by the WCJ.
Dr. Nunley noted on January 3, 2005, that Lee had a herniated disc with radiculopathy in her neck. As a course of treatment, he recommended C6 selective nerve root blocks, followed by an ACDF if the nerve root blocks were ineffective. According to the March 24, 2005, report from Dr. Nunley's office, three nerve root blocks had not helped alleviate her symptoms. After that date, the ACDF was pursued.
Dr. Gordon Mead, an orthopedic surgeon, examined Lee on June 20, 2005. His conclusion in his report was that Lee *285 lacked objective findings of nerve root impingement, and was at maximum medical improvement. Therefore, Dr. Mead felt that surgery was not indicated. Clearly, there was a dispute between the parties about both Lee's condition and whether she needed additional treatment. The dispute was not solely based upon the surgery, although that was an aspect of the dispute. The trial court did not err in ordering the IME.
Request for Surgery
Lee argues that the WCJ was clearly wrong in denying her request for the ACDF surgery.
Filed into evidence were the report and deposition of Dr. Mead. When Dr. Mead evaluated Lee on June 20, 2005, he was not aware that Lee had been involved in a recent automobile accident, as she did not tell him about it. Dr. Mead agreed with the conclusions of the radiologist that the May 2004 MRI showed degenerative disease at C5-6 with a bulge at the C5 and C6 levels without any nerve root impingement. The lumbar spine looked normal. He also agreed with the radiologist's interpretation of the February 2005 MRI as showing small central disc protrusion at C5-6 with mild degenerative changes at C4-5. No nerve root impingement was noted. Dr. Mead thought for all intents and purposes that the two cervical spine MRIs were identical.
Dr. Mead's impression was that Lee had a pre-existing degenerative cervical disc disease, but did not have a lumbar disc disease. He believed that she most likely strained her neck, and possibly her back, at the time of injury, and that this temporary aggravation of the pre-existing degenerative disease should have taken three to six months to resolve. Because there was no objective finding of nerve root impingement, Dr. Mead did not feel that surgery was necessary to treat Lee's pain, and he did not agree with Dr. Nunley's recommendation of an ACDF. Dr. Mead stated that cervical disc surgery can be successful in relieving symptoms from nerve root impingement, but not in relieving vague pain complaints. Dr. Mead considered Lee to be at maximum medical improvement, and he recommended that she receive a functional capacity evaluation and be returned to the workforce. Dr. Mead did not feel that additional medical treatment was necessary.
Dr. Mead does not perform cervical spine surgeries. He has a general orthopedic surgery practice. The lumbar surgeries he performed in the past were usually lumbar discectomy and lumbar laminectomy.
The IME was conducted by Dr. Karl Bilderback on January 16, 2006. Reviewing the cervical spine MRI from May of 2004, Dr. Bilderback found mild spondylosis at C4-5 with a tiny disc bulge, a slightly larger bulge and very mild exit foramen stenosis at C5-6, and a smaller bulge at C6-7 with no exit foramen stenosis. There was little change on the MRI taken in February of 2005. Dr. Bilderback decided that in the absence of evidence of cervical or lumbar radiculopathy or cervical or lumbar segmental instability, he could not recommend surgery for Lee. Dr. Bilderback also believed that Lee had reached maximum medical improvement for the injuries she received in April of 2004.
The opinion of the IME physician is not conclusive, and the WCJ must evaluate all of the evidence presented in making a decision as to the claimant's condition. McKinney v. Coleman, 36,958 (La.App.2d Cir.3/14/03), 839 So.2d 1240. The record supports the finding that the ACDF is not a reasonable and necessary medical *286 treatment. The WCJ was not clearly wrong in denying Lee's claim for a ACDF.
Because Lee is not entitled to the ACDF, she is not entitled to an award of penalty and attorney fees relating to the timeliness of the second medical opinion.[1] That medical opinion was the basis for the adjuster's denial of the surgery request.
We note the request for surgery was received by the adjuster on April 11, 2005. The second medical opinion examination was scheduled for May 23, 2005, within 60 days of the receipt of the request for surgery, but Lee failed to show for the appointment.
Original Award of Attorney Fees
Lee urges that the original award of $2,000.00 in attorney fees is too low. The WCJ awarded attorney fees and a penalty because of Heritage Manor's improper calculation of indemnity benefits.
A WCJ has great discretion in awarding or denying penalties and attorney fees. Nowlin v. Breck Const. Co., 30,622 (La.App.2d Cir.6/24/98), 715 So.2d 112. We find no abuse of the WCJ's discretion in awarding attorney fees in the amount of $2,000.00 for that particular claim.

CONCLUSION
We amend the judgment to award SEBs in the amount of $357.00 per month commencing on April 13, 2005. We also amend the judgment to assess an additional penalty of $2,000.00, and to award additional attorney fees of $2,000.00. Therefore, Lee is awarded total penalties of $4,000.00 and total attorney fees of $4,000.00. In all other respects, the judgment is affirmed.
At Heritage Manor's costs, the judgment is AFFIRMED IN PART and REVERSED IN PART.
NOTES
[1] La. R.S. 23:1201(E) requires that medical benefits be paid within 60 days after the employer or insurer receives written notice thereof.