839 So.2d 1240 (2003)
Barbara McKINNEY, Plaintiff-Appellant,
v.
U.L. COLEMAN and Louisiana Worker"s Compensation Corp., Defendants-Appellees.
No. 36,958-WCA.
Court of Appeal of Louisiana, Second Circuit.
March 14, 2003.
*1241 Law Offices of Jack M. Bailey, Jr. By Jack M. Bailey, Jr., J. Allen Cooper, Jr., Mary Lou Salley, Shreveport, for Appellant.
Hudson, Potts & Bernstein By Jan Peter Christiansen, Monroe, for Appellees.
Before BROWN, STEWART and DREW, JJ.
DREW, J.
In this workers' compensation proceedings, Barbara McKinney appeals the denial of her request for lumbar spine surgery. We affirm.

FACTS
McKinney alleges that on September 1, 1999, she was cleaning an apartment for defendant when she slipped and fell, injuring her back, hip and shoulders, and sustaining chemical burns to her buttocks. She also alleges that on October 26, 1999, she stepped off a sidewalk while at work and experienced severe low back pain.
An examination of the record reveals the following relevant medical history of McKinney:
 September 1, 1999: Treatment by Dr. William Till for chemical burns secondary to the fall.
 September 2, 1999: McKinney complained of mid-back pain to Dr. Till.
 September 7, 1999: Treatment for the chemical burns by Dr. John Epling. McKinney was also apparently treated at the LSUMC Burn Center later that month.
 October 18, 1999: McKinney was examined by orthopedic surgeon Dr. A. Edward Dean. She complained of pain in her lower back, left shoulder and right hip. It was evident to Dr. Dean that the pain was mainly in her lower back. X-ray of the lumbar spine showed no definite abnormalities, but there may have been some slight narrowing and sacralization at L5-S1. Dr. Dean felt that she should be referred to another physician because he was unable to be of any further assistance regarding her treatment. Dr. Dean released McKinney and referred her to Dr. Edward Simonton as she requested.
 October 26, 1999: McKinney was treated by Dr. John Epling. She complained *1242 that she felt something pop in her back and experienced worsened pain after she stepped down off a sidewalk.
 November 2, 1999, to March 24, 2000: McKinney was treated by a chiropractor, Dr. John Thompson. She reached maximum chiropractic improvement in March 2000 and was released and instructed to visit her primary care physician.
 September 1, 2000: McKinney was treated by orthopedic surgeon Dr. Pierce Nunley. She complained of pain in her neck, left shoulder and left back. X-ray of the lumbar spine revealed some spondylosis at L4-5 and L5-S1. He diagnosed low back pain with possible stenosis. Among Dr. Nunley's suggestions were a MRI of the cervical and lumbar spines, and physical therapy to evaluate and treat the cervical and lumbar spines.
 September 18, 2000, to November 20, 2000: McKinney underwent physical therapy as prescribed by Dr. Nunley.
 October 3, 2000: McKinney received MRI's of the lumbar and cervical spines. Dr. Nunley's interpretation of the lumbar MRI was "[d]egenerative disc disease at 4-5 with broad base disc bulge creating mild central stenosis and moderate to severe lateral stenosis."
 October 13, 2000: Dr. Nunley noted that therapy had helped McKinney somewhat, and that her major complaint was low back pain. He recommended an epidural steroid injection ("ESI") at L4-5. If she did not experience significant improvement after the ESI, then he thought she would be a good candidate for surgery.
 October 18, 2000: The ESI was performed.
 November 1, 2000: McKinney saw Dr. Nunley for a follow-up visit. There was little improvement from the ESI. Dr. Nunley believed that McKinney had exhausted her conservative management options. He noted that McKinney wanted to consider surgery, which he thought was reasonable. He recommended a discography.
 November 27, 2000: Electro-diagnostic examination and nerve conduction studies were performed by Dr. David Adams. He found electro-diagnostic evidence of bilateral carpal tunnel syndrome, but no such evidence of radiculopathy was found in the upper or lower extremities.
 December 18, 2000: A discography was performed by Dr. Nunley at discs L3-4 and L4-5.
 December 20, 2000: Dr. Nunley explained to McKinney the results of the discography, which showed concordant pain at 4-5 and a control level at 3-4. He also discussed her options, which were to do nothing or to have a "fairly significant procedure on her back." The surgical options included a posterior lumbar interbody decompression, a posterior lumbar interbody fusion and a pedicle screw instrumentation. Dr. Nunley advised McKinney that if she could live with the condition and be satisfied, then that would be his recommendation. If she could not, then he felt that surgery was reasonable.
 March 28, 2001: McKinney was evaluated by Dr. Edwin Simonton for a second opinion on behalf of defendants. Dr. Simonton stated that McKinney "[did] not have clinical findings to indicate an active or on-going injury of an orthopedic nature which *1243 requires surgery." He believed that she had a myoligamental strain of the lumbar spine, from which she was recovering well, and he felt that her back problems persisted due to her prolonged period of reduced activity. He opined that McKinney had previously reached maximum medical recovery, and had lost some ground due to her reduced activity. He thought she should be able to return to work at that time, with some temporary restrictions.
On December 12, 2001, McKinney amended her 1008 Claim Form to seek a lumbar decompression at L4-5 as recommended by Dr. Nunley. Defendants requested utilization review.[1]
By letter dated December 17, 2001, McKinney received notice that she was to submit to an Independent Medical Examination ("IME") in Monroe on January 21, 2002. McKinney filed a motion for a protective order praying that the WCJ appoint an IME physician in Shreveport. The WCJ denied the motion for a protective order. On March 28, 2002, this court granted McKinney's supervisory writ and ordered the WCJ to appoint an IME physician from the Shreveport-Bossier City area.
By letter dated April 17, 2002, claimant received notice from the Office of Workers' Compensation that an IME had been scheduled with orthopedic surgeon Dr. Gordon Mead on April 29, 2002, to address the necessity of a lumbar decompression at L4-5.
Dr. Mead examined McKinney on April 29, 2002. He agreed with Dr. Nunley's interpretation of the lumbar MRI as showing a diffuse L4 disc bulge. Dr. Mead remarked in his evaluation:
It is my impression that this lady most likely sustained cervical and lumbar strain and sprain at the time of her injury. At this time, I find no objective evidence to support anything other than a soft tissue strain of her cervical spine. It is impossible to tell whether the bulging lumbar disc on MRI is a naturally-occurring finding in this lady at the age of 41 or whether it has anything to do with her injury or her persistent complaints of back pain.
Due to her obesity and her general lack of objective findings, I would not recommend that this lady undergo any surgery. I am unable to explain the level of her complaints of pain based on objective findings.
In my opinion, she should be able to do at least light duty type work. I probably would recommend against heavy lifting and repeated bending because of the bulging lumbar disc. I think this is a permanent condition.
I think she has essentially reached maximum medical improvement. I would not recommend any further evaluation or specific treatment.
Accordingly, the OWC did not recommend the lumbar surgery.
By judgment rendered on July 30, 2002, the WCJ found that McKinney was not entitled to the lumbar decompression at L4-5. McKinney appealed.

DISCUSSION
Necessity of Surgery
McKinney first argues on appeal that the WCJ erred in giving greater *1244 weight to the opinion of the IME physician, Dr. Mead, rather than to the opinion of McKinney's treating physician, Dr. Nunley. McKinney points out that Dr. Nunley is an orthopedic surgeon who practices in the subspecialty of spinal surgery, while Dr. Mead is a general orthopedic surgeon who does not perform spinal surgeries and is without a subspecialty. Dr. Simonton has not performed a surgical procedure in over a decade.
The general rule is that the testimony of a treating physician should be accorded greater weight than that of a physician who examines a patient only once or twice. Williams v. Wal-Mart Stores, Inc., 00-0863 (La.App. 4th Cir.5/16/01), 787 So.2d 1134. However, La. R.S. 23:1123 provides:
If any dispute arises as to the condition of the employee, the director, upon application of any party, shall order an examination of the employee to be made by a medical practitioner selected and appointed by the director. The medical examiner shall report his conclusions from the examination to the director and to the parties and such report shall be prima facie evidence of the facts therein stated in any subsequent proceedings under this Chapter.
Our emphasis.
Nevertheless, the opinion of the IME physician is not conclusive, and the WCJ must evaluate all of the evidence presented in making a decision as to the claimant's condition. Jennings American Legion Hosp. v. Daigle, 01-621 (La.App. 3rd Cir.11/14/01), 801 So.2d 550. The significant weight given to the opinion of the IME physician can be lesser or greater depending on the qualifications or expertise of the physician, the type of examination he performs, his opportunity to observe the patient, his review of other physicians' examinations and tests, and any other relevant factors. Green v. Louisiana Coca Cola Bottling Co., Ltd., 477 So.2d 904 (La.App. 4th Cir.1985), writ denied, 478 So.2d 910 (La.1985).
We note that Dr. Nunley did quite a bit of editorializing in his patient notes, initially about Dr. Simonton and then later in anticipation of Dr. Mead's decision:
December 13, 2001OFFICE VISIT:
The patient is here for follow-up. Apparently she has seen Dr. Simonton for a second opinion, and he has denied surgery. I find this puzzling as the patient has x-rays but we have not released our MRI, so therefore he didn't look at any studies. Also, he does not do fusions, so I am a bit curious as to why Worker's Comp would want a second opinion on a complex case to be obtained from someone who actually doesn't do the procedure.
* * *
May 3, 2002OFFICE VISIT:
The patient is here for follow up. She went to her second opinion with Dr. Mead. I haven't read the opinion but I can almost assuredly know that it is not in favor of surgery. In my experience I have never seen Dr. Mead approve lumbar fusion surgery.
From a WC standpoint it also needs to be pointed out that Dr. Mead is not a spine surgeon. He does not do lumbar fusion surgeries and hasn't in at least many years.
I do not feel that it is appropriate for a doctor to give a second opinion on a procedure that they do not do as part of *1245 their normal practice. They certainly cannot understand the indications and contraindications of the patient's selection that's needed in order to make an appropriate decision as a spine surgeon who does similar procedures as part of their normal practice.
Dr. Nunley also provided a lengthy rebuttal of Dr. Mead's conclusion in a July 15, 2002, patient note:
There have been some questions that have come up regarding Ms. McKinney's care and [I] would like to clarify my position.
Regarding objective evidence for the patient's condition it needs to be pointed out that she does have significant objective evidence. This is evidenced by the findings on MRI. She also has a transitional syndrome which is seen on x-ray which is correlated with increased lumbar disc syndromes. She also has a discogram which is demonstrated positive concordant pain at L4-5 as well as a control level....
I do not believe that her obesity will substantially affect any outcome from surgery. I have certainly operated on many patients that are even more obese than she is and with our operative techniques, do not feel that this will affect her outcome. There are some increased risks in doing the surgery itself and sometimes it would take a little bit longer to rehabilitate after the procedure but the final outcome should not be substantially affected. As far as the question about her disc and whether or not it was degenerative or pre-existing, I feel strongly, based on the data collected to date and primarily the fact that she has concordant discogenic pain at L4-5 as well as the objective findings on MRI that with a reasonable degree of medical certainty, her disc is the focus of the principal pain syndrome that she suffers from and is more likely than not related to the slip and fall that she allegedly sustained on September 1, 1999.
* * *
Although it is not a comfortable position to disagree with a colleague, I feel it is important since this patient's future is at stake, I think I need to be candid about her complicated lumbar spine condition. A Fellowship trained, Board Certified surgeon who specializes and treats essentially only spinal conditions who is going to do a technique that is not even performed in this community. The fusion is performed by a few other surgeons in this community. It is inappropriate for any doctor, no matter what their credentials are to give an opinion on a complicated case like this, if they do not do this kind of surgery or at least similar kinds of surgery treating the same conditions. This by no means is a comment directly against Dr. Mead, more to the fact that this is a complicated case just as if it were a difficult shoulder case, I should not give an opinion on that even though I am a Board Certified surgeon and have done many shoulder cases in the past.
Dr. Mead had the benefit of various medical reports in reaching his conclusion that McKinney had reached maximum medical improvement and should not undergo any surgery. This was essentially the same conclusion reached by Dr. Simonton. Incidentally, in October of 1999, McKinney requested that Dr. A. Edward Dean refer her to Dr. Simonton. Although Dr. Nunley as McKinney's treating physician was a strong advocate of surgery, we note that according to Dr. Nunley's patient *1246 notes from December 2000, when he discussed treatment options with McKinney, he told her that he would recommend that nothing be done if she could live with her condition. In addition, we recognize that although Dr. Nunley was McKinney's treating physician, he did not treat her for this injury until a year after she slipped and fell. Accordingly, we decline to disturb the credibility determination made by the WCJ in giving greater weight to Dr. Mead's independent conclusion. The WCJ was not clearly wrong in denying the requested medical procedure.
Results of Discogram
McKinney next contends the WCJ erred in relying on statements from defense counsel that Dr. Mead reviewed the discogram results. The statements were made at the hearing to determine whether the lumbar surgery would be approved:
[THE COURT:] This Court would point out and would note that Dr. Mead had an opportunity to review the medical evidence presented from Dr. Simonton, as well as Dr. Nunley. However, the Court would note, I believe the parties, counsel for the parties, did indicate with one exception, Dr. Mead not having the benefit of the outcome of the discogram, is that correct?
MS. SALLEY: That is correct.
MR. CHRISTIANSEN: That is correct.
THE COURT: The Court would note that in most instances it would give primary weight to the Independent Medical Examiner; however, in this case, this Court would note that one additional piece of evidence, the outcome of the discogram. As such, the Court would note the greatest specialty possessed by Dr. Nunley; i.e., being an orthopedic surgeon with a subspecialty in spinal surgery. The Court would also note
MR. CHRISTIANSEN: Judge, if I could back up for a second.
THE COURT: Yes, sir.
MR. CHRISTIANSEN: A thought just occurred to me that I just wanted to point out. Dr. Nunley discussed the results of the discogram in his December 29, 2000 note, and that would have been reviewed by Dr. Mead. So Dr. Mead may not have actuallyI guess, I don't know what kind of films or results you would have with a discogram, but Dr. Mead would have been able to review Dr. Nunley's reports and would have seen that one report regarding the results of the discogram.
MS. SALLEY: I think the Court would say he didn't address it in his findings.
MR. CHRISTIANSEN: That's true. Dr. Mead did not address the discogram in his report.
THE COURT: Okay. The Court was under the impression that Dr. Mead did not see the discogram report. But as pointed out by Mr. Christiansen, based upon that, Dr. Mead, at best, having possession of the report of Dr. Nunley, the Court, at this particular time, would deny the surgery recommended by Dr. Nunley, and accord greater weight to the Independent Medical Examiner, Dr. Gordon Mead, in conjunction with the medical opinion of Dr. Edmond Simonton.
We note that McKinney's counsel, Ms. Salley, did not object to Mr. Christiansen's statements to the court. Mr. Christiansen was not testifying, but simply pointing out to the court that the results of the discogram were contained in Dr. Nunley's reports. Dr. Mead stated that he had "reports from Dr. Nunley's office as well as the above-mentioned other reports." Dr. *1247 Nunley's reports consisted mostly of patient notes, separate MRI interpretations and the discography operative note and flow-sheet. The MRI interpretations were one of the "above-mentioned reports." In the patient notes, which were cumulative in nature, Dr. Nunley referred to test results, his impressions and what he discussed with McKinney on all of her visits up to that point. Dr. Nunley discussed the discogram results with McKinney during a December 29, 2000, office visit. The notes from this visit are on page four of an eight-page patient record. Thus, if Dr. Mead did not have the actual discography operative note in his possession, then he would have had the patient notes in which the discography was discussed. Finally, the results of the discogram, which showed that McKinney experienced pain at L4-5, were not conclusive to the inquiry of whether the bulging disc was related to her job injury.
Notice
McKinney next complains that neither she nor her attorney received timely notice of the IME. La. R.S. 23:1124 provides, in part:
A. If the employee refuses to submit himself to a medical examination at the behest of the employer or an examination conducted pursuant to R.S. 23:1123, or in anywise obstructs the same, his right to compensation and to take or prosecute any further proceedings under this Chapter shall be suspended until the examination takes place. The employee shall receive at least fourteen days written notice prior to the examination. When a right to compensation is suspended no compensation shall be payable in respect to the period of suspension.
Our emphasis.
Defendants clearly violated this statute as the letter giving notice of the IME was dated April 17, 2002, with the IME set for April 29, 2002. McKinney also complains that her counsel did not receive a copy of this letter and did not learn of the IME until defendants filed a motion for a continuance on May 3, 2002.
However, the failure to provide McKinney timely notice did not prejudice her case. Objections to the qualifications of Dr. Mead were made perfectly clear in Dr. Nunley's patient notes. In addition, McKinney's counsel never objected to the untimely notice at the hearing. Finally, we take note of La. R.S. 23:1317.1, which provides, in part:
F. Objections to the independent medical examination shall be made on form LDOL-WC-1008, and shall be set for hearing before a workers' compensation judge within thirty days of receipt. No mediation shall be scheduled on disputes arising under this Section.
Nothing in this record indicates that McKinney's counsel filed this objection upon learning of Dr. Mead's appointment. McKinney's contention is without merit.

DECREE
At appellant's cost, the judgment is AFFIRMED.
NOTES
[1] We recognize that Dr. Nunley stated in the December 13, 2001, patient notes that there "seems to be some confusion that all I am wanting is a lumbar decompression L4-5." He then refers to the December 29, 2000, patient notes. He also later criticizes Dr. Mead's expertise regarding fusion surgery. Nevertheless, a lumbar decompression is the treatment sought by McKinney in her amended claim.